JOHN B. BALL et ux.

*v.*

SIDNEY S. WARD et al.

[Decided October 13th, 1909.]

1. Evidence *held* to show that a deed was induced by threats· of the
grantee of the immediate arrest and imprisonment of a son of the grantors
for obtaining money from the grantee under false pretences.

2. A grantor, suing to set aside a deed induced by the threats of the

grantee of the arrest of a son of the grantor for obtaining money under false pretences, on the ground that the deed was executed pursuant to an agreement to stifle a criminal prosecution, must allege and prove that a crime had been committed by the son which was compounded, or the prosecution of which was stifled.

3. Evidence, in a suit to set aside a deed as induced by the threats of the grantee of the arrest of a son of the grantor for obtaining money by false pretences *held* not to show that the money was obtained under false pretences, and that the threats for his arrest were threats of unlawful imprisonment.

4. An agreement between debtor and creditor to compound a crime committed by the debtor, or to stifle the prosecution thereof, makes the transaction for the payment of the debt illegal, which illegality may be unconnected with the question of duress, for the illegal agreement may be offered by the debtor himself voluntarily and without any pressure from the creditor.

5. It is against equity for a creditor to extort from a parent payment of or security for the debt of a son, for which the parent is not responsible, by threats of criminal prosecution of the son, though an imprisonment of the son would be lawful or supposed to be lawful, and contracts of the parent for such payment or security, executed under circumstances created by the creditor which deprive the parent of the freedom and power of deliberation necessary to validate such transactions, may be avoided in equity, as made without consent.

Heard on bill, answer, replication and proofs.

*Mr. Chandler W. Riker* (*Messrs. Riker & Riker,* solicitors), for the complainants.

*Mr. Alfred F. Skinner* (*Mr. Benjamin C. Demarest,* solicitor), for the defendants.

EMERY, V. C.

The bill is filed by John B. Ball and wife, to set aside two conveyances of land made by them to Sidney S. Ward, on November 29th, 1905, on the ground that they were executed under duress or threats. The duress alleged in their bill is that of threats of the immediate arrest and imprisonment of their son, Arthur D. Ball, for obtaining money of Mr. Ward under false representations. Complainants claim that under the pressure and influence of these threats, made to them on the Sunday preceding (November 26th, 1905), and, believing the threats would be carried

out, they agreed on that day to make the conveyances, without any opportunity for obtaining counsel or advice, and did afterwards make them while under such influence and pressure. Mr. Sidney S. Ward and his wife, Mary Ward, were the original defendants to the bill, filed March 31st, 1906, and their answer under oath (Mrs. Ward answering on information and belief) denies the duress or threats charged in the bill, and as to the circumstances of the execution of the deed, the answer avers that Arthur D. Ball, who was the son-in-law of Ward and had married his daughter and only child in January, 1902, had borrowed from Ward between October, 1903, and April 28th, 1905, $23,500, besides procuring Ward's endorsement on March 21st, 1904, of Arthur Ball's note at three months for $15,000, which note was renewed from time to time, and was outstanding at the time of the conveyances. All these advances and the endorsements are averred to have been procured by Arthur Ball on his statement to Mr. Ward that they were to be used by Arthur as his contribution to a joint venture or speculation in which he was engaged as one of a syndicate, and which promised to be very profitable. After endorsing the note, and on April 28th, 1905, Mr. Ward, as his answer avers, made another loan to Arthur Ball of $3,800, to enable the latter to purchase a gas plant at Boonton. As to this advance there is no allegation in the answer that it was to be for Arthur's share or part in any joint venture or syndicate operation. The advances remaining unpaid and the note being twice renewed, Mr. Ward, having his suspicions aroused as to Arthur Ball's representations, made inquiries of the person whom Arthur Ball had represented to have charge of the joint venture, and, in the language of the answer,

"was informed by him that there was no such joint venture or speculation, and that at the times when the said Sidney S. Ward had loaned to the said Arthur D. Ball the various sums of money above mentioned, the said Arthur D. Ball had not paid said money to any syndicate in which the said Arthur D. Ball was interested with said person."

"Whereupon," the answer continues, "the defendant Sidney S. Ward became satisfied that the said sums of money had been secured from him by misrepresentations and fraud."

The answer avers that subsequent to this information Ward caused an examination of the records to be made, and ascertained that on April 13th, 1898, Arthur D. Ball, for the expressed consideration of one dollar, had conveyed to his father, John B. Ball, property on Johnson avenue, in Newark, and that on January 8th, 1902, the day of his marriage to defendant's daughter, Arthur D. Ball had by a like deed conveyed to his father a house and tract of land at Deal, Monmouth county. The Johnson avenue house was the home of complainants, and up to the time of his marriage their son had resided there with them. The Deal place was a summer home in which, as is claimed by the answer, Arthur and his wife resided in the summer, and to the maintenance of which he contributed largely. Having ascertained these facts relating to the representations of Arthur Ball, and the conveyances of the property, the answer of Ward as to the circumstances of executing the deeds, says that on Sunday, November 26th, 1905, he called on complainants at their residence (the Johnson avenue property), told them that Arthur had obtained a large sum of money by these representations, that he had ascertained the representations were false and fraudulent, that Arthur was a bankrupt, and that inasmuch as the properties on Johnson avenue and at Deal had been conveyed to John B. Ball for one dollar, they, having received these properties by gift without consideration, should be willing to turn them over to the said Sidney S. Ward in part payment of the indebtedness of their son Arthur to him, and that thereupon the complainants expressed their sympathy for him, and regretted he had been wronged and offered to convey the properties. The use of any threats of the arrest or imprisonment of Arthur Ball at this interview or at subsequent interviews is also explicitly denied in the answer.

The bill charges a repetition of these threats of arrest at two subsequent interviews with Ward at his home on the same Sunday, one in the morning between Mr. Ward and John B. Ball, who had gone there to see his son, but did not see him, and another in the afternoon, in the bedroom occupied by Arthur, and at which Mr. and Mrs. Ward, Mr. and Mrs. John B. Ball and Mr. and Mrs. Arthur D. Ball were present. And it is

further charged that at the latter interview there was made a threat of immediate direction, by telephone, of the arrest, if the complainants did not at once agree to transfer the properties, and that under pressure of these threats they then made the promises.

All of these allegations of threats and pressure are specifically denied by the answer under oath, and it is averred that at all of the interviews at defendant's house the complainants were not only willing, but appeared to be anxious to turn over their properties to Ward.

Subsequent to the filing of the answer Mr. Sidney Ward died, and later, and before the hearing, Mrs. Ward also died. The suit was revived against the devisees and executors of Mr. Ward's will, of whom Mrs. Arthur D. Ball is one, and is now defendant, both individually and as executor and trustee.

At the hearing the direct evidence on the part of complainants as to the circumstances under which the agreement to execute the deeds was made, was that of the two complainants and their son, Arthur Ball. The evidence of the complainants was at first objected to as not admissible against the defendant executrix and devisee, but the objection was afterwards formally withdrawn. On the part of the defendants the direct evidence is that of the answers under oath, and of Mrs. Arthur D. Ball. There are circumstances appearing in connection with the evidence of all the witnesses called at the hearing, which to some extent affect their credibility as to details of the interviews, as given at the hearing, but the case is certainly one where the decision on the substantial question of fact in dispute depends on the credit given to the witnesses. This question is whether the conveyances were the result of such pressure by threats of Arthur Ball's immediate arrest on a criminal charge as to overcome the free will of the grantors in giving their consent to make the deeds and afterwards executing them. If the account of complainants and of Arthur Ball is true, then they were so procured, and on the other hand, if the answers and the account of Mrs. Arthur Ball are true, the deeds were not executed under any pressure, but were the voluntary acts of complainants for the purpose of repairing to some extent a wrong done by their son to Mr. Ward, and cannot now be rescinded.

My impression at the hearing was that, duly weighing this conflict of evidence, the complainants had made out that the deeds were not voluntary, but were induced by pressure put on them by the threats of imprisonment. I retain this view on reading over the evidence again and further consideration, and there are certain undisputed facts appearing by the evidence which tend to corroborate this view and indicate that these deeds were executed under this pressure, and were not voluntary conveyances by the parents to pay the debts of their son.

The Balls were elderly people; both well over sixty, and Mr. Ball had but moderate means, being employed on a salary, and the deeds in question comprised about all his property. Mrs. John Ball herself had no separate estate or property.

The Johnson avenue property undoubtedly belonged to John Ball and was paid for and the homestead built thereon by his own means. His son originally purchased for $1,000 the vacant lot on which there was a mortgage of $3,000, and conveyed it to his father a few months later for the same price, which his father paid, subsequently paying the mortgage. To raise money the father sold another house in which he lived for $5,600, and then built a house on the Johnson avenue lot costing about $8,500 and using also for this purpose the proceeds of a mortgage on the lot for $6,500. Arthur Ball seems to have had no money whatever in this property at the time of the conveyances. As to the Deal property the evidence that Arthur did not contribute toward the construction of the house is not so clear or satisfactory, but it does sufficiently appear that his father did advance money toward the construction, and that at the time of the conveyance to Mr. John Ball by Arthur at the time of the latter's marriage, John Ball had considerable money invested in the property, if he had not built it entirely, and so far as Arthur's subsequent creditors were concerned, no ground appears for supposing that John Ball's title to the property was subject to their claims.

In the early part of November Mr. Ward had searches made upon Arthur Ball's and John Ball's property, and after obtaining these, on Saturday morning, November 25th, had an interview with Mr. Uzal McCarter, the gentleman named as having con-

trol of the joint venture. On Saturday evening Mr. Ward had an interview with Arthur Ball at his (Ward's) home. At this interview Mr. Ward seems to have accused Arthur of having obtained his money under false representations, but so far as appears by the meagre account of it, given by Arthur and his wife (the only two witnesses), there was no reference in that interview to any conveyance of their property by Arthur's parents. On Sunday morning Mr. Ward went alone to the residence of the complainants, reaching there before breakfast, and had an interview, in which they learned for the first time, and from Mr. Ward, that their son was a bankrupt and had, as he said, obtained money wrongfully from him. That in this interview some reference to a conveyance of the two tracts held by John Ball was made, appears by the sworn answers and the evidence of both the complainants. One question is whether there was then and at that interview, which was not very long, any definite agreement or offer to make the transfer, as is set up in the answer. Mrs. Ball says that she was willing to make the transfer in order to save Arthur from the arrest which Mr. Ward threatened, but her husband was not, and wanted time to think about it. Her husband makes substantially the same statement. The interview ended by an appointment for a subsequent interview on the same day at Mr. Ward's house, corroborating somewhat Mr. Ball's statement that he was not ready to consent at once. After this interview, and in the morning, Mr. Ball went to his son's house in Clinton avenue to see him, but finding that he had gone to Mr. Ward's house in East Orange, went there about ten o'clock for the purpose of seeing his son. Mr. Ward met him and told him that his son was then lying down or asleep and should not be disturbed, and he then took Mr. Ball into his own room or "den." Previous to John Ball's arrival and when Arthur came to his father-in-law's house that morning, Mr. Ward told Arthur (according to Arthur's statement) that he had been down to his father's and had told his parents about his indebtedness and that if they did not turn over their property he (Arthur) would be arrested. Arthur then owned his home on Clinton avenue in Newark and offered to turn over this residence, but protested against Ward's demanding that his father's

property should be turned over for his (Arthur's) debts. To this Mr. Ward replied "that if he didn't get it, he would have me arrested." There are two important features of this evidence—*first,* that Arthur, according to his own account, is now for the first time, as it would appear, advised that his father-in-law proposed to arrest him on some charge of criminality in his dealings with him, and *second,* that his arrest was to be made unless not only Arthur but his parents conveyed their property, and that now both Arthur and his parents knew of the threats. Arthur, after this interview with Mr. Ward, went to a room in the house to lie down and did not know of his father's visit to the house in the morning. Mr. Ward and Mr. John Ball had a short interview alone, as to which nothing important bearing on the matter of threats or conveyances has been sworn to on either side.

The afternoon appointment was kept, Mr. and Mrs. Ball first having an interview with Mr. Ward in the den, at which Mrs. Ward was present. Arthur Ball, from the bedroom near the den, in which he was lying down, heard the conversation. Arthur himself took no part in this conversation, but after this interview all four came over to the bedroom in which Arthur was. At the interview in the den and also in the bedroom, according to Mr. and Mrs. John Ball and Arthur Ball, the threats of immediate arrest of Arthur were made, unless the parents agreed to convey the properties, and as Mr. Ball hesitated to agree, Mrs. Ward was, as they say, sent to the telephone twice or three times by Mr. Ward, with directions to notify the lawyer to proceed at once. Mrs. Ball herself appealed to her husband to consent in order to save Arthur and finally he did consent, and in Arthur's room, where he and his parents met for the first time since they had information as to his father-in-law's claim against him, he was first informed or learned that his parents had given up all their property to pay a portion of his debts. According to his own and his father's and mother's statements this consent was forced from the parents by threats of his immediate arrest for crime in obtaining money from Mr. Ward, which threats were made to the parents within Arthur's hearing. According to the answers and also the testimony of Mrs. Arthur

Ball, this consent was then given in Arthur's presence, but as a voluntary offer of reimbursement, and without any threats, either then or previously made.

In considering the sworn answers and all the evidence relating to this interview, in which according to all of them, the consent to the conveyances was definitely given in Arthur's presence, I find one important feature on which there is no dispute. This is the fact that, although Arthur had no previous interview with either his father or mother relating to the charge against him or to his debts, and in this interview was first informed or first learned of their consent to make the transfer of all their property for his benefit, not a single witness who swears as to the interview, either in the answer or at the hearing, and including Arthur himself, says in his account that Arthur made any objection or protest whatever against his parents stripping themselves of all their property to pay his debts, or made any disclosure to them as to his debts, or expressed any gratitude to them. This silence, in which all witnesses agree, is fully explained and accounted for if Arthur then knew of the threats to his parents as well as himself of his arrest unless the conveyances were made, and was willing that his parents should make this sacrifice to save him. If the promise to convey was voluntary, this silence on Arthur's part is not, in my judgment, accounted for.

This same feature of the evidence—Arthur's silence on the question of the transfer of his parents' property—appears in the accounts as to the final interview on Monday morning at Mr. Ward's house, when the deeds for the properties (or copies of the descriptions) were delivered to Mr. Ward by Arthur, in the presence of the same witnesses. And there are some very important and undisputed facts appearing as the result of all the evidence and bearing directly upon the question, which are all consistent with the view that the promise to make the deeds was the result of some immediate pressure, but which are not satisfactorily explained on the view that the promise was a purely voluntary promise to pay Arthur's debts. These are the haste in which the promise was made, being the result of interviews on Sunday, the first day the parties met; the absence of counsel or advice to the Balls in relation to the apparently im-

provident transfer of all their property to pay part of their son's debts, and the absence of any statements, agreements or examinations as to the amount of Arthur's debts which the conveyances were to pay, and of any arrangement at the time for any credit on the debts.

The concurrence of these undisputed facts indicate that for some reason a transfer was agreed on, which was to be immediate, and which left indefinite and unadjusted, matters which ordinarily would have been agreed on had the transaction been a mere voluntary conveyance by the complainants for the purpose of paying part of their son's debts.

The cumulative force of these undisputed facts is strongly corroborative of the complainants' direct evidence of undue pressure by the use of threats. Weighing all the evidence and considering it with the aid of the very full and able arguments of counsel on almost all its phases, I can reach no other conclusion than that the final agreement by complainants to convey the properties, and the delivery of the deeds to Mr. Ward for the purpose of having them drawn and executed, were procured by the threats of Arthur's immediate imprisonment if they were not executed. These promises were carried out and the deeds executed without delay or further interview between John B. Ball and Mr. Ward, and, as I conclude, while the complainants were still under the influence of this pressure. The complainants had no counsel or adviser then or at any time, and the formal execution and acknowledgment of the deeds as their voluntary acts, before Mr. Ward's counsel, and their conversation with him at the time without disclosing that they were the result of threats, while it is a circumstance to be considered in weighing their evidence, is not, of itself, sufficient to make the deeds voluntary acts, if the grantors executed them, as I conclude they did, under the belief, induced by the grantee at their previous interviews, that their son would be immediately arrested if the deeds were not made, and under the belief that if the deeds were made, directions for his arrest would not be given. The grantee allowed them to act on this belief, and gave the grantors deeds to his own counsel with direction for the conveyances to himself. This counsel states that at the interview in

his office, and before he signed the deeds, Mr. Ball inquired of him whether his son Arthur had done anything criminal, to which he replied that Mr. Ward had informed him (Demarest) that Arthur had secured money under false representations, and that was all he (Demarest) knew about it. This conversation shows that at the time of the execution and delivery of the deeds, the idea that Mr. Ward charged Arthur with crime was still impressed on the grantor, and the reply of counsel, whether so intended or not, would tend to confirm rather than lessen the effect of any threats, if they had been previously made.

The fact that complainants after finally making the promise to convey acted without any advice or counsel in the actual execution of the deeds of this character and delivered them without the execution of any other paper or statement for their protection, either in relation to Arthur's debts or their future rights of any kind in the property, confirms rather than challenges the view that the deeds were the result of the threats, and were not voluntary acts.

In reference to the execution of these deeds, I think the evidence further shows that there was at least an understanding between the parties, not expressed in words, but clearly implied, that if the deeds were made Arthur would not be prosecuted criminally at all. The arrest for the crime threatened was the immediate arrest; the directions for this were withdrawn on receiving the promise for the deeds, and this promise and the execution of the deeds were by all the parties treated as settling the matter of the arrest. The express agreement or direction reached no farther, perhaps, than the arrest then proposed, and there was not in express words any agreement that no future prosecution for the alleged crime should be made.

The question whether there was an agreement to stifle a prosecution which affected the deeds with illegality might be important if complainants asserted such illegality as a basis of relief, but as no arrest was made and no prosecution was actually pending, it would be necessary for complainants to allege and prove that in fact a crime had been committed, which was compounded, or the prosecution of which had been stifled. *Manning* v. *Columbian Lodge (Court of Errors and Appeals, 1898), 57 N. J.*

*Eq.* (*12 Dick.*) *338.* In the present case illegality of the deeds, as based on the stifling of a criminal prosecution, or compounding a crime, is not set up in the bill as a ground of relief, nor is it alleged that any crime was committed by Arthur, and on the contrary, at the hearing the complainants insisted that it appeared that the charge of misrepresentation made by the answer was shown to be false. It was the defendant who insisted that upon the proofs it was shown that the crime had been committed, and this proof was relied on as making the threats those of *lawful* rather than unlawful imprisonment—the essential element, it was claimed, of duress.

The status of the case as to the proof of the crime charged may thus be an element to be considered, and it is as follows:

The answer alleges that all the advances by Mr. Ward to Arthur and his endorsements for him from October, 1903, to April 28th, 1905 (including the endorsement for $15,000 originally procured March 21st, 1904, and renewed from time to time every three months) were procured by Arthur on his statement that they were to be used by Arthur as his contribution to a joint venture or speculation in which he was engaged as one of a syndicate. The charge of the answer is that as Mr. Ward was informed in November, 1905, by the person named by Arthur as having charge of the venture for the syndicate,

"there was no such joint venture or speculation and that at the times when the said Ward had loaned to the said Arthur the various sums of money above mentioned, the said Arthur had not paid said money to any syndicate in which the said Arthur was interested with said person."

Mr. Uzal McCarter, the gentleman referred to as thus having charge, was called as defendants' witness and testified that Arthur Ball was one of a syndicate with himself and several others for purchasing stock, and that the operations of this syndicate were closed out on December 31st, 1904, and that after this date Arthur Ball had no interest in any syndicate with himself and others, but that there was one joint venture after that date in which he and Ball were the only ones jointly engaged, in which, however, he (McCarter) had carried the account from the beginning. Mr. McCarter's further evidence is that Mr. Ward,

on his application to him for information, stated that Arthur
Ball had borrowed large sums of money from him (Ward) and
had not paid them back and had given as the reason for not pay-
ing that Mr. McCarter had not yet made distribution of the
funds.  This statement was not true, as Mr. Ward was then
informed by Mr. McCarter, who immediately sent for Arthur
Ball and demanded a retraction.  Arthur Ball then denied to
Mr. McCarter making any statement to Mr. Ward that he was
withholding funds belonging to him.  Arthur Ball himself says
that he put $10,000 into this syndicate and afterwards received
this back, and although admitting that money was borrowed from
his father-in-law to the extent of at least $17,500 from October,
1903, to April, 1904 (besides the endorsement of $15,000 in
March, 1904), says that when borrowed it was on statements
that he wanted it for use in speculation, but not on the statement
that it was to be used in the syndicate.  He further admits stat-
ing to Mr. Ward at the time of applications for money beyond
the $10,000 originally advanced to him to go into the syndicate,
that the distribution of the funds of the syndicate had been
delayed.  It does not appear that he ever informed Mr. Ward
that the syndicate operations had been closed out in December,
1904, while it does appear that after this date the $15,000 note
(a three months' note) was renewed more than once, Mr. Ward
apparently being ignorant until November, 1905, of the fact
that the syndicate operations were closed out and that there
was no money from this source due to Arthur.  As Arthur Ball
had received back the $10,000 put into the syndicate and had not
paid anything to Mr. Ward, and Mr. Ward was still continuing
the endorsements, the reasons for his not informing Mr. Ward
that the syndicate operations had been closed and leading him to
to suppose that they still continued, are quite apparent.  As it
appears by the proofs that Arthur Ball was originally one of the
syndicate and did put into it some of the money advanced by Mr.
Ward, and that the operations of this syndicate were not closed
out until December 31st, 1904, after which date Mr. Ward ad-
vanced no more money to Arthur Ball, (except the $3,800 which,
as the answer states, was advanced for purposes other than this
syndicate), it is clear, I think, that the particular charge of

false representations set out in the answer, viz., "that there was no such joint venture or syndicate, and that Arthur had not paid any of the money borrowed to any syndicate," has not been established. It would rather seem from the evidence of Mr. McCarter that the false representation made to Mr. Ward probably was that the funds of the syndicate were still undistributed, and Arthur's own testimony, as well as his failure to disclose the termination of the syndicate in December, 1904, corroborates this view. Such statement and conduct of Arthur's would probably have induced the renewal of the endorsements of the $15,000 note after December, 1904, but there is no proof that after the syndicate was in fact closed out any money was obtained from Mr. Ward on Arthur's statement that its funds were undistributed. I conclude, therefore, that the charge of crime set up in the answer that the moneys were obtained under the false pretences therein specified has not been made out, and that if the threats were for the arrest on this charge, they were not in point of fact made on the threat of lawful imprisonment. As Arthur had, however, while procuring from Mr. Ward the continuance of his endorsements of the $15,000 note after December, 1904, continued to mislead Mr. Ward, or allow him to be misled, in reference to the closing out of the syndicate operations and his receipt of the money coming to him under them, Mr. Ward, upon receiving information in November, 1905, that there then were no syndicate funds for distribution, was perhaps justified in believing that deception had been practiced on him, justifying criminal proceedings, and on this aspect of the whole case the question arises, whether threats of imprisonment, either lawful or honestly supposed to be lawful by the person making threats, will avoid deeds made under their pressure by a parent.

Whether threats of lawful imprisonment by criminal proceedings, made to the debtor himself, in order to induce him to pay his own debts, are of themselves ground for setting aside the debtor's deeds or mortgages given to pay or secure the debt, under the pressure of the threats, where there is no agreement to compound a crime or stifle a criminal prosecution, is not the question involved in this case. As to the debtor himself, it may be said that his lawful prosecution either civilly or criminally can be no

wrong, and that his acts done in payment of the debts could not be avoided merely for threats of such legal pressure. An agreement, however, between the debtor and creditor, to compound the crime or stifle the prosecution, makes the transaction for payment of his own debts illegal, and the weight of authority seems to be that the debtor himself, although *in delicto,* may for this kind of illegality avoid his own contracts, upon the ground of the public policy, that a creditor is not permitted to trade on the public crime for his own profit. Illegality of this character, however, is, or at least may be, altogether unconnected with the question of undue pressure, for the illegal agreement may be offered by the debtor himself or his parents or other surety, voluntarily and without any pressure by the creditor, but this would not clear the illegality which inheres in the agreement itself, whatever its origin.

But the precise question in the present case is whether deeds made to the creditor by a parent of the debtor, and without consideration from the creditor, will be avoided in equity if made under the influence of such pressure of threats of imprisonment (lawful or supposed to be lawful), as to overcome the free agency of the grantor. In the single case in this court in which the question was said to be directly involved (*Lomerson* v. *Johnston* (*1888*), *44 N. J. Eq.* (*17 Stew.*) *93*), Vice-Chancellor Bird decided that a mortgage upon a wife's real estate was executed by her under such pressure of threats of her husband's arrest for embezzlement, as to overcome her free agency, and that in equity it should be set aside. The court of errors and appeals (*2 Dick. 314, 1890*) affirmed the decree, upon the ground, however, that the proofs showed that the creditor knowingly gave the wife the false impression that her husband was to be immediately arrested, and allowed the wife to make the mortgage under this false apprehension. It was held to be inequitable to permit him to retain the mortgage thus obtained.

As I understand the opinion of the appellate court the state of mind of the grantor in which the mortgage was executed was held to be of vital consequence to the validity of the security, considered as a contract based on consent, and if this state of mind inducing the deed—the fear of her husband's arrest—was

procured by false impressions knowingly created by the creditor, his conduct in creating this state of mind to extort the consent was illegal, and the illegality vitiated the security in a court of equity, which would set it aside. Whether the security could have been retained had the same state of mind been induced and the consent extorted by threats honestly made, was not decided, and the circumstance that the appellate court, in disposing of the case, held that this question was not involved, prevents, as I take it, the opinion of Vice-Chancellor Bird on this point in the case below, from being considered as an authority controlling my decision on this part, although due weight must be given to his learned examination of the question. The decision of the appellate court, however, does seem to be express authority to the point that if the state of mind or motive of the wife, a stranger to the debt, in conveying her property to secure the husband's debt, was induced and her consent extorted by illegal acts of the creditor, such as fraudulently creating a belief of arrest, the security will be avoided in equity for such illegality, and this was decided upon equitable principles applicable to the validity of consent to execute contracts and without any inquiry or consideration of the application of the common-law doctrine of duress *per minas.* When this consent is procured by the creditor by a fraudulently created belief, or an unlawfully created fear (as in the *Loremson-Johnson Case, supra),* there seems to be no difference of opinion as to the right to avoid the contracts, the general equitable ground being that stated by Mr. Justice Holmes in *Silsbee* v. *Webber (1898), 171 Mass. 378, 380, &c.,* viz., that of obtaining a contract by creating a motive from which the other party ought to be free, and which in fact is, and is known to be, sufficient to produce the result. He further says, *Ibid. 381,* that some of the cases allow contracts to be avoided obtained by the threat of unquestionably legal acts, and cites the leading English, New York and Massachusetts decisions. Mr. Justice Knowlton, in his dissenting opinion, also affirms this principle, and says (*p. 384*) that it is an abuse of process and misuse of the machinery of law, which the law will not permit, for one who reasonably believes his debtor to be guilty of crime, to extort the collection of a private debt by threats of prosecution and im-

prisonment for crime, these being proceedings intended only to impose punishment in the interest of the public, that contracts so procured may be avoided for duress, and that it is equally a wrong and an injury to accomplish the same results through threats of such abuse or process.

The ground taken by the defendant's counsel on this branch of the case, is, that in order to avoid these deeds in equity, as made under pressure of threats of imprisonment for crime, the pressure must be such as at common law amounted to duress *per minas,* and this, as is claimed, must be a threat of unlawful imprisonment as distinguished from lawful imprisonment; it is claimed that at common law duress *per minas* was not as a general rule pleadable by any person other than the one threatened with imprisonment, the only exception to this rule being duress to a husband, wife, parent or child, by threats of imprisonment of the wife, husband, child or parent. And it is then insisted that this exception, as to the person threatened, which gives the parent the right to question his contracts made by duress to his child, and as if he were himself the person threatened, did not change in favor of the parent, the nature of the duress to be proved, or give him the right to avoid deeds executed under pressure of threats of lawful imprisonment to the child.

It has been held in this court that mortgages by the debtor himself to secure his own lawful debts, claimed to have been executed under threats of lawful criminal prosecution, could not be avoided as made under duress, even if such coercion were proved. *Bodine* v. *Morgan (Chancellor Runyon, 1883),* 37 *N. J. Eq. (10 Stew.) 426, 428.* It was found, however, as matter of fact, in this case, that coercion was not established, but that the mortgage was in fact voluntary, and this same feature—the voluntary execution of the deeds or contracts—appears also in the other New Jersey cases of duress by threats of lawful imprisonment, either criminal or civil. In *Clark* v. *Turnbull (Supreme Court, 1885),* 47 *N. J. Law (18 Vr.) 265,* it is said (at *p. 267),* that there was no pretence that the imprisonment (of defendant's brother in a civil suit) was unlawful, or that the note of defendant sued on was coerced or even asked for by the plaintiff. In *Tooker* v. *Sloan (Chancellor Runyon, 1879),* 30

*N. J. Eq.* (*3 Stew.*) *394,* the legal proceedings threatened against the husband do not appear to have been criminal proceedings, and the property upon which the wife gave the mortgage to settle the claims against the husband was found to be in fact the husband's property, held by the wife in trust for him (at *p. 397*). Coercion does not seem to have been proved. In *Smillie* v. *Titus* (*Chancellor Runyon, 1880*), *32 N. J. Eq.* (*5 Stew.*) *51,* it is expressly found that the mortgage given by the husband and wife on the husband's property, to pay the husband's debt, arising from an embezzlement, was given voluntarily and that there was no ground to suspect oppression or imposition. In several other cases referred to by defendant's counsel, the general rule at law has been stated in the opinion as being that the duress must be by threats of unlawful imprisonment, but the precise point now in question, viz., whether as against a parent, being a stranger to the debt, contracts for paying or securing the debt of a child, procured by threats of his imprisonment in criminal proceedings and having the effect of overcoming free agency are valid either at law or in equity, has not been either considered or decided, except in *Lomerson* v. *Johnson.* The most thorough examination of the question of the equitable status of contracts so procured is in the leading English case, *Williams* v. *Bayley* (*1866*), *L. R. 1 H. L. 200; 35 L. J. Ch. 717,* which has been approved and followed in many, if not all, of the American courts. In this case a father, under the pressure of threats by a creditor, of his son's imprisonment for a felony, gave a mortgage on his property, to secure the son's debt. There was no question in the case as to the commission of crime, and that the threats were of imprisonment, which if it took place would be lawful, for the son had forged the father's name on notes or bills, and the notes or bills, with the forged signatures, were delivered to the father upon his executing the agreements for security. On a bill filed by the father offering to return the notes, he sought to avoid the security on two grounds—*first,* of undue pressure in procuring their execution; and *second,* of illegality in compounding a crime. Vice-Chancellor Stuart, before whom the cause was tried, held that the agreements were void because executed under a pressure which drove the father to comply with

the terms exacted by operating on his fears, and deprived him of the freedom of action necessary to the validity of an agreement. *Bayley* v. *Williams, 11 Jur.* (*N. S.*) *236, 237.* The question of illegality for compounding a felony was not considered, it being, as the vice-chancellor said (at *p. 237*), not the province of the court of equity to decide whether crimes or misdemeanors have been committed, and the decision was based entirely on the equitable principles relating to relief from contracts to which consent had been extorted by undue pressure and to which there was no real consent. On appeal the case was argued for the appellants by Sir Hugh Cairns, and for the respondents by Sir R. Palmer, both afterwards lord chancellors. The imprisonment threatened was clearly lawful, but in none of the arguments, nor in any of the opinions in either court, does it seem to have been suggested that the question to be decided depended in any way upon any common law rule, that in a case of this character duress existed only if the threats were of unlawful imprisonment. On the appeal the opinion of the three lord chancellors—Cranworth, Chelmsford and Westbury—who delivered the opinions, all agreed in affirming the decree. Lord Cranworth's opinion went upon the ground that a pressure put on the parent by threats to prosecute his son for forgery if the parent did not take upon himself the payment of his son's debts, and by promises not to prosecute if he did, was an illegal pressure; and he also found that one object of the agreement was to stifle a criminal prosecution. Lord Chelmsford agrees that the security in question was extorted from the father by undue pressure, and says that "the case comes within the principles on which a court of equity proceeds in setting aside an agreement where there is inequality between the parties, and one of them takes an unfair advantage of the situation of the other and uses undue influence to force an agreement from him." Lord Westbury, in his thorough and forcible opinion, places the case on the ground (*35 L. J. Ch.* *725*) that the only motive appearing in the case to induce the father to adopt his son's debt was the hope that by so doing he would relieve his son from the inevitable consequences of his crime, and that the question therefore was whether a father, appealed to under such circumstances, to take upon himself an

amount of civil liability, with the knowledge that unless he does so, his son will be exposed to a criminal prosecution, with the certainty of a conviction, can be regarded as a free agent." His opinion on this question, without hesitation, was "that no man is safe, or ought to be safe, who takes a security for the debt of a felon from the father of a felon, under such circumstances." He further holds that a contract to give security for the debt of another being a contract without consideration should be based on the free and voluntary agency of the individual who enters into it, and that it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether taken away from a father who is brought into the situation of either refusing and leaving his son in that perilous condition, or of taking on himself the amount of the civil obligation. On this aspect of the case he concludes that the security given for the debt of the son by the father, under such circumstances, was not the security of a man who acted with that freedom and power of deliberation that must undoubtedly be considered necessary to validate a security of this description. On the other question involved, whether independently of pressure, the transaction was illegal as founded on an agreement to stifle a prosecution, and to give up evidence of crime—the forged bills—for the purpose of securing a private benefit, "it is," he says (at *p. 726*), "unquestionably a law, dictated by the soundest consideration of policy and morality, that you should not make a trade of felony."

In *Eadie* v. *Slimmon* (*1862*), *26 N. Y. 10,* the same principle as to undue pressure was applied, declaring void an assignment of a life insurance policy by a wife to pay her husband's debts, procured by threats of his imprisonment, and under circumstances which overcame her free agency. Later cases in this state affirm this ground of equitable relief and hold that the fact that the threats are of lawful imprisonment do not make the transaction valid. *Adams* v. *Irving National Bank* (*1889*), *116 N. Y. 606,* where money paid by a wife to the husband's creditor for his debt, under threats of his arrest, was recovered back. This is the rule also in Massachusetts, and in this state the securities given under these circumstances seem

to have been declared void in suits at law, under the issue of duress. *Harris* v. *Carmody* (*1881*), *131 Mass. 51; Morse* v. *Woodworth* (*1891*), *155 Mass. 233; Silsbee* v. *Webber* (*1898*), *171 Mass. 378.*

The same rule that similar contracts procured under threats of prosecution from persons standing in these relations and under such pressure as to overcome free agency, will be avoided in equity, seems to be adopted in most, if not all, of the American courts. The latest cases, and from a number of states, are collected in *20 L. R. A.* (*N. S.*) *486,* in a note to the case, *Williamson, &c., Co.* v. *Ackerman* (*1908*), *77 Kan. 502; 94 Pac. Rep. 807.* Many of the earlier decisions are collated in *26 L. R. A. 48* (note), and are also referred to in *Burton* v. *McMillan* (*Fla., 1907*), *42 So. 849; 8 L. R. A.* (*N. S.*) *991,* but as the cases I have above referred to at length sufficiently bring out the substantial reasons on which the cases proceed, further citation of cases in detail is unnecessary.

In my judgment, the equitable rule to be applied in this case is the one illustrated in these cases, viz., that it is against equity and good conscience for a creditor to extort from a parent payment of or security for the debt of a son for which the parent is not responsible, by threats of criminal prosecution of the son, even if the imprisonment be lawful, or supposed to be lawful, and that contracts of the parent for such payment or security executed under circumstances created by the creditor which deprive the parent of the freedom and power of deliberation necessary to validate transactions of this description, may be avoided in a court of equity, as made without consent. A decree will be advised setting aside the deeds.